Filed 4/4/16  P. v. Palmer CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066803 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD253727) |
| FREDERICK JOSEPH PALMER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Polly H. Shamoon, Judge.  Affirmed.

Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Marvin Mizell, Kimberley A. Donohue and Samantha Begovich, Deputy Attorneys General, for Plaintiff and Respondent.

A San Diego County jury found Frederick Joseph Palmer guilty of one count of selling a controlled substance (count 1: Health & Saf. Code, § 11352, subd. (a)) and one count of misdemeanor resisting arrest (count 2: Pen. Code, § 148, subd. (a)). At a bifurcated proceeding, the court found to be true allegations that (1) Palmer had suffered one prior narcotics sales conviction (Health & Saf. Code,§ 11370.2, subd. (a)), (2) he had also suffered one prior strike conviction (Pen. Code, § 245, subd. (a)(1)) for purposes of the Three Strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, 668), and (3) he had served two prior prison terms (Pen. Code, §§ 667.5, subd. (b), 668).

The court denied Palmer's motion under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) to strike the prior strike conviction (*Romero* motion) and sentenced him for his count 1 conviction to an aggregate term of 11 years in state prison, consisting of the middle term of four years, doubled under the Three Strikes law to eight years, plus a consecutive prison term of three years for the court's true finding on the allegation Palmer had suffered a prior narcotics sales conviction. For Palmer's count 2 misdemeanor conviction, the court sentenced him to a concurrent term of 180 days. The court struck the two prison prior allegations.

Palmer appeals, contending both of his convictions (selling a controlled substance and resisting arrest) must be reversed because (1) the court improperly sustained an undercover police officer's assertion of the surveillance location privilege provided by

2

Evidence Code[1] section 1040, (2) the court prejudicially erred by failing to sua sponte instruct the jury under CALCRIM No. 251 regarding the required union or joint operation of act and mental state, and (3) the cumulative effect of the court's errors undermined the fundamental fairness of the trial and the reliability of the guilty verdicts. Palmer also contends (4) his conviction of selling a controlled substance should be reversed because the court prejudicially erred by failing to sua sponte instruct the jury under CALCRIM No. 332 regarding the weight to give expert testimony, and (5) his sentence must be reversed and the matter remanded for a new sentencing hearing because the court abused its discretion and violated his federal constitutional right to due process by denying his *Romero* motion to strike his prior strike conviction. We affirm the judgment.

FACTUAL BACKGROUND

A. *The People's Case*

On January 24, 2014, Palmer sold 0.16 grams of cocaine base to San Diego Police Officer Radford Pajita. Officer Pajita testified that at around 5:00 p.m., while he working undercover as a member of a narcotics sale surveillance team (surveillance team), he approached a group of four people—two men and two women—on the southeast corner of Park Boulevard and E Street in San Diego, an area known for high narcotics activity. He asked the shorter of the two men—a Black male wearing a Black hoodie—for a "twenty," which is street jargon for $20 worth of narcotics. The man said he did not have any. As Officer Pajita began to walk away, the other man—a bigger Black male wearing a gray

---

[1]    All further statutory references are to the Evidence Code unless otherwise specified.

hooded sweatshirt (Palmer)─asked Officer Pajita what he was looking for. When Officer Pajita said he wanted a "twenty," Palmer looked both ways down Park Boulevard and then held out his hand. In his hand were three rocks of cocaine base. Officer Pajita, who was wearing a one-way radio transmitter, handed Palmer a prerecorded $20 bill in exchange for the cocaine base. Officer Pajita began walking away and then transmitted a "bust signal" to the other police officers in the surveillance team, who were monitoring his unrecorded transmissions. Officer Pajita testified he gave the other officers a description of the person from whom he had bought the drugs, telling them he was a Black male wearing a gray hooded sweatshirt and "wired" glasses.

At trial, Officer Pajita identified Palmer, who was in the courtroom, as the man who sold him the cocaine base. Officer Pajita testified that he recognized Palmer because he and Palmer were "literally a foot apart" at the time of the transaction, and he noticed at that time that Palmer's hair was tied in the back in a pony tail and he wore wired glasses.

After Officer Pajita identified Palmer, the prosecutor showed Officer Pajita a photograph and asked him whether he recognized it. Officer Pajita responded that he recognized it as a photograph of Palmer that was taken on January 24, 2014, after he was arrested. Officer Pajita testified that the photograph accurately depicted what Palmer looked like on that day because it showed Palmer wearing the "same clothing," the "same wire glasses," the "same hooded sweatshirt" that "he was wearing when he sold [Officer Pajita] the narcotics and when he was taken into custody." The photograph was then shown to the jury.

4

San Diego Police Detective Jesus Sanchez testified he was part of the surveillance team on January 24, 2014; he was wearing plain clothes and monitoring Officer Pajita over the one-way wire that Officer Pajita was wearing; and he heard Officer Pajita say: "Gray sweatshirt, gray sweatshirt." Detective Sanchez testified that this meant that Officer Pajita "had just purchased narcotics from somebody wearing a gray sweatshirt." Detective Sanchez testified that as Officer Pajita was saying this, he (Detective Sanchez) saw a Black male wearing a gray sweatshirt walking along Park Boulevard away from Officer Pajita and then turning onto E Street. Detective Sanchez testified he "lost visual as soon as [the Black male] turned the corner." He did not see anyone else wearing a gray sweatshirt. Detective Sanchez radioed the man's description and direction of travel to uniformed officers, including San Diego Police Officer Marlo Woods.

Officer Woods, wearing a full police uniform and driving a marked police vehicle, observed a Black male wearing a gray hooded sweatshirt walking westbound near Park Boulevard. At trial, Officer Woods identified Palmer as the man he observed from his police vehicle. Officer Woods testified that he had been called in by one of the undercover officers in the area to "detain that person." Officer Woods also testified that, after he saw Palmer, he stopped and exited his vehicle, approached Palmer on the 1100 block of E Street, and told him to wait there. As Officer Woods approached him, Palmer began walking backwards and started looking around. Officer Woods testified he had a feeling Palmer was getting ready to run, so he told Palmer not to run. Palmer then "took off running."

5

Officer Woods further testified that Palmer ran across E Street, jumped a fence, and ran through a parking lot toward 11th Avenue. While Officer Woods pursued him on foot, San Diego Officer Christopher Blomberg, who also was wearing a police uniform and driving a marked police vehicle, drove toward Palmer's location on 11th Avenue. Officer Blomberg drove his vehicle onto the sidewalk, got out, and yelled at Palmer to stop. Palmer stopped running and turned around. Officer Woods ordered Palmer to get on the ground, and he complied. Officers Woods and Blomberg then arrested Palmer. At trial, Officer Blomberg identified Palmer as the suspect he handcuffed.

B. *Defense Case*

The defense did not present any evidence. During closing arguments, defense counsel argued that the prosecution failed to prove beyond a reasonable doubt that Palmer was the person who sold the cocaine base to Officer Pajita.

DISCUSSION

I. *OFFICER PAJITA'S ASSERTION OF THE SURVEILLANCE LOCATION PRIVILEGE (§ 1040)*

Palmer first contends his convictions of selling a controlled substance and resisting arrest must be reversed because (1) the court prejudicially erred when it sustained Officer Pajita's claim of privilege under section 1040 (the surveillance location privilege) without following the procedures mandated by section 1040 and 1042, and (2) the errors violated his constitutional rights to confrontation, a fair trial, and due process by precluding testimony by Officer Pajita−regarding the number and location of the other

6

members of the surveillance team—that was material to his defense of mistaken identity. We reject these contentions.

A. *Background*

Officer Pajita, the member of the surveillance team who testified that Palmer gave him cocaine base in exchange for a prerecorded $20 bill, twice invoked the surveillance location privilege under section 1040 in response to questions defense counsel asked him during his cross examination. In the first question, defense counsel asked, "Where was the surveillance [team]?" In response, Officer Pajita stated, "I would like to invoke Evidence Code 1040." The court immediately sustained that claim of privilege. Defense counsel then asked the court to "explain to the jury why the [claim of privilege] is being sustained so that it's not left open." The court told the jury, "Officer safety reasons. That's information the court is not going to require the witness to disclose."

Later during his cross-examination, Officer Pajita claimed the surveillance location privilege again when defense counsel asked him questions about how many members of the surveillance team *observed* the drug sale transaction. Specifically, the following exchange occurred between defense counsel and Officer Pajita:

> "[Defense counsel]: How many people roughly were involved from the law enforcement aspect that day?
>
> "[Officer Pajita]: Seven.
>
> "[Defense counsel]: So including yourself, there [were] six people *in observation of the events*?
>
> "[Officer Pajita]: No.

7

"[Defense counsel]: How many were *observing* what was going on?" (Italics added.)

Officer Pajita then invoked the surveillance location privilege a second time, stating, "Once again, this is going to be the Evidence Code 1040." The court then asked both counsel to approach for a sidebar conference.

During the sidebar conference, the court discussed the matter with counsel and then sustained Officer Pajita's invocation of the surveillance location privilege, indicating it would not require him to answer any questions that would compromise his safety or the safety the other surveillance team officers.

B. *Surveillance Location Privilege* (§§ *1040, 1042*)

"[S]ection 1040 provides governmental entities with a privilege to refuse to disclose confidential official information when the public interest in preserving the confidentiality of the information 'outweighs the necessity for disclosure in the interest of justice.'" (*People v. Acevedo* (2012) 209 Cal.App.4th 1040, 1053 (*Acevedo*), quoting § 1040, subd. (b)(2).[2])

As pertinent here, section 1040 establishes, under appropriate circumstances, a surveillance location privilege under which information about the location of a police surveillance post is entitled to the protection of a confidential privilege of nondisclosure.

---

2      Section 1040, subdivision (b)(2) provides: "(b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so and . . . [¶] . . . [¶] (2) [d]isclosure of the information is *against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice* . . . ." (Italics added.)

(*People v. Lewis* (2009) 172 Cal.App.4th 1426, 1431 (*Lewis*); *People v. Walker* (1991) 230 Cal.App.3d 230, 235; *People v. Montgomery* (1988) 205 Cal.App.3d 1011, 1018-1019 (*Montgomery*).)

Once the surveillance location privilege has been asserted under section 1040, it is the defendant's burden to make a prima facie showing of his or her need for disclosure of the information. (*Montgomery*, *supra*, 205 Cal.App.3d at p. 1021.) "[T]he defendant must show more than a '"mere suspicion"' that the information sought will prove '"relevant and helpful"' to his defense," or that it will be helpful to a fair determination in the case. (*Acevedo*, *supra*, 209 Cal.App.4th at p. 1055.)

If the defendant makes a sufficient threshold showing of his or her need for disclosure of the confidential information regarding the location of the police officer's surveillance post, the trial court may conduct an in camera hearing under section 915, attended by the party claiming the privilege (here, Officer Pajita and/or the prosecutor). (§ 915, subd. (b);[3] *Montgomery*, *supra*, 205 Cal.App.4th at p. 1021.) "The defendant should be given an opportunity to propose questions to be asked at this hearing. The in

_____

[3] Section 915, subdivision (b) provides: "When a court is ruling on a claim of privilege under [section 1040] and is unable to do so without requiring disclosure of the information claimed to be privileged, the court *may* require the person from whom disclosure is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person authorized to claim the privilege and any other persons as the person authorized to claim the privilege is willing to have present. If the judge determines that the information is privileged, neither the judge nor any other person may ever disclose, without the consent of a person authorized to permit disclosure, what was disclosed in the course of the proceedings in chambers." (Italics added.)

camera hearing is a preliminary inquiry into whether the claim of privilege should be upheld." (*Montgomery*, at p. 1021.)

"Section 1042 provides that when the trial court in a criminal case permits the prosecution to invoke the section 1040 [surveillance location] privilege, the court 'shall make such *order or finding of fact adverse to the* [*prosecution*] *as is required by law* upon any issue in the proceeding to which the privileged information is *material*.'" (*Lewis*, *supra*, 172 Cal.App.4th at p. 1432, quoting § 1042, subd. (a) (hereafter § 1042(a)),[4] italics added.) An adverse "order or finding" required by section 1042(a) may, for example, take the form of "an order striking the officer's testimony regarding his observations, *from the privileged location*, of the defendant's narcotics sale activities." (*Lewis*, at p. 1433, citing *Hines v. Superior Court* (1988) 203 Cal.App.3d 1231, 1236, italics added.) "This provision in section 1042 is intended to preserve the constitutionality of the section 1040 privilege by ensuring that its application does not detract from the constitutional rights of criminal defendants to confrontation, cross-examination, and a fair trial." (*Lewis*, at p. 1432.)

*Lewis* also explained that the following "standard of materiality" applies for determining whether confidential information about a police officer's surveillance post is

---

4  Section 1042(a) provides: "Except where disclosure is forbidden by an act of the Congress of the United States, if a claim of privilege under this article by the state or a public entity in this state is sustained in a criminal proceeding, the presiding officer shall make such *order or finding of fact adverse to the public entity bringing the proceeding as is required by law* upon any issue in the proceeding to which the privileged information is *material*." (Italics added.)

10

"material" within the meaning of section 1042(a) such that an order or finding adverse to the public entity claiming the privilege may be required under that subdivision:

> "[T]he *location from which the surveillance was performed* is *not material*, for the purpose of section 1042's adverse finding requirement, if the accuracy of the *testifying officer's testimony about the surveillance observations* is unquestioned, or at least is sufficiently corroborated by independent evidence such that there is no realistic possibility that disclosing the surveillance location would create a reasonable doubt in the minds of a reasonable jury about the officer's veracity." (*Lewis*, *supra*, 172 Cal.App.4th at p. 1438, italics added.)

*Lewis* clarified that, "by its plain terms, section 1042 does not require an adverse order or finding whenever a privileged surveillance location is *relevant*. It requires such measures only when the location is *material*. '[T]he test of materiality is not simple relevance; it is whether the nondisclosure might deprive defendant of his or her due process right to a fair trial.'" (*Lewis*, *supra*, 172 Cal.App.4th at p. 1441.)

C. *Analysis*

In support of his contention that the court prejudicially erred by sustaining Officer Pajita's assertion of the surveillance location privilege without following the procedures mandated by sections 1040 and 1042, Palmer asserts he "was not given the opportunity to make a prima facie showing for disclosure" of the information he sought to elicit from Officer Pajita about the undisclosed location of the other members of the surveillance team and the number of those officers who observed the narcotics transaction. The Attorney General responds that Palmer "did not make that required showing, and nothing in the record suggests the trial court denied [him] the opportunity to do so." We agree.

11

As already discussed, once the surveillance location privilege has been asserted under section 1040, it is the defendant's burden to make a prima facie showing of his or her need for disclosure of the information. (*Montgomery*, *supra*, 205 Cal.App.3d at p. 1021.)

Here, the record shows that, immediately after Officer Pajita invoked the surveillance location privilege the first time, the court stated, "That will be sustained." However, rather than take the opportunity to ask for a sidebar conference to attempt to make the requisite prima facie showing for disclosure, Palmer's counsel asked the court to explain to the jury why the claim of privilege "[was] being sustained so that it's not left open." The court obliged and told the jury, "Officer safety reasons. That's information the court is not going to require the witness to disclose." That the court would have granted a request for a sidebar conference is shown by the fact that soon thereafter the court itself called for such a conference. Specifically, when Officer Pajita invoked the surveillance location privilege again after defense counsel asked him how many surveillance team officers "were observing what was going on," the court directed counsel to approach for a sidebar conference. During this conference, defense counsel had a second opportunity to make a prima facie showing for disclosure. Although the conference was not reported, a settled statement prepared by Palmer's appellate counsel, Cynthia Grimm, shows that the court discussed the matter with counsel and then stated it

12

would not require him to answer any questions that would compromise his safety or the safety of the other surveillance team officers.[5]

Based on the foregoing record, we conclude Palmer has failed to meet his burden of demonstrating the court erred by denying him the opportunity to make a prima facie showing for disclosure of the surveillance team information defense counsel sought to elicit from Officer Pajita.

Even if we were to assume the court erred by denying Palmer the opportunity to make a prima facie showing for disclosure of the confidential surveillance team information, we would conclude any such error was harmless because he would not have been able to establish a prima facie need for such disclosure. Palmer's defense at trial was that the prosecution had failed to prove beyond a reasonable doubt that he was the person who sold the cocaine base to Officer Pajita. As already noted, the information Officer Pajita sought to keep confidential by asserting the surveillance location privilege was (1) the location of the other members of the surveillance team, and (2) the number of those surveillance team officers who observed the narcotics transaction that took place between Palmer and Officer Pajita. However, the only *testifying* witness who observed the narcotics transaction was Officer Pajita, who engaged in the face-to-face transaction with Palmer. Thus, only Officer Pajita's eyewitness identification of Palmer as the person

---

5       Specifically, the settled statement, which was prepared pursuant to a court order under rule 8.346(b) of the California Rules of Court, states: "During the unreported sidebar conference, after a discussion among the court and counsel, the court stated it would not require Officer Pajita to answer any questions that might compromise Officer Pajita's or the other officers' safety."

13

who sold him the cocaine base would be subject to challenge. The credibility of Officer Pajita, who testified that he and Palmer were "literally a foot apart" at the time of the transaction, would not be affected by the specific location or number of the other members of the surveillance team who observed the transaction.

Palmer also contends that (1) even if the court properly sustained the surveillance location privilege, the surveillance team information he sought to elicit from Officer Pajita was "material" to his defense of mistaken identity within the meaning of section 1042(a)[6] because there was a "possibility . . . that [Officer] Pajita was mistaken when he identified [him] and that a member of the surveillance team saw someone else selling the drugs to [Officer] Pajita"; and, thus (2) the court erred by failing to "make an adverse finding, such as striking [Officer Pajita's] testimony" under section 1042(a). These contentions are unavailing for two reasons.

First, by asserting there was a "possibility" Officer Pajita was mistaken when he identified him, Palmer essentially is challenging the sufficiency of the evidence to support his convictions by suggesting Officer Pajita's testimony was not credible and required corroboration. Palmer complains that Officer Pajita's testimony about the drug transaction and his identification of Palmer as the seller of the drugs were "not . . . corroborated by any independent evidence." However, "[t]he uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284,

---

6       See footnote 4, *ante*.

296.)  Here, Officer Pajita's testimony is neither physically impossible nor inherently improbable.

Second, Palmer has not shown, and cannot demonstrate, that the confidential surveillance team information his counsel sought to elicit from Officer Pajita was "material" to Palmer's defense of mistaken identity within the meaning of section 1042(a).  Under the applicable *Lewis* standard of materiality (discussed, *ante*) on which Palmer relies, such confidential information is "material" within the meaning of section 1042(a) if (1) the accuracy of the *testifying* officer's testimony about his or her observations *from the confidential surveillance location* is questioned, and (2) there is a realistic possibility that disclosure of the surveillance location would create a reasonable doubt in the minds of a reasonable jury about the veracity of the *testifying* officer's testimony about his or her observations *from the surveillance location*.  (*Lewis*, *supra*, 172 Cal.App.4th at p. 1438.)

Here, for purposes of section 1042(a) under the *Lewis* standard of materiality, Officer Pajita, not the other undercover surveillance team officers who observed the transaction from their undisclosed locations, was the testifying officer who testified about the narcotics transaction itself and identified Palmer as the seller of the narcotics.  None of the other surveillance team officers testified about their observations of the narcotics transaction from their confidential surveillance locations.  Thus, with respect to Officer Pajita's testimony, which Palmer challenges, the privileged information about the locations of the other surveillance team officers, and about the number of those officers

15

who observed the narcotics transaction, was not "material" within the meaning of section 1042(a) under the *Lewis* standard of materiality.

In this regard we note that the privileged information also was not material with respect to the testimony of Officer Sanchez. Officer Sanchez testified he was wearing plain clothes at the time of the drug transaction, he heard Officer Pajita's transmission that the suspect was wearing a gray sweatshirt, at the same time he saw a Black male wearing a gray sweatshirt walking along Park Boulevard away from Officer Pajita and then turning onto E Street, and he did not see anyone else wearing a gray sweatshirt. Palmer asserts that "[i]f [he] had been provided the information about the surveillance team's location and number of officers observing the undercover operation, he may have been able to show that because of distance or obstruction, none of the members of the surveillance team, including [Officer] Sanchez, [was] in a position to see the actual perpetrator as he walked away from [Officer] Pajita."

We conclude the privileged information was not material within the meaning of section 1042(a) with respect to the testimony of Officer Sanchez because his testimony was sufficiently corroborated by Officer Woods. (*Lewis*, *supra*, 172 Cal.App.4th at p. 1438 ["the location from which the surveillance was performed is not material . . . if the accuracy of the testifying officer's testimony about the surveillance observations is . . . sufficiently corroborated by independent evidence"].) Specifically, Officer Woods testified that, as he was driving a marked police vehicle after being called in with a description of the suspect, he observed a Black male wearing a gray hooded sweatshirt walking westbound near Park Boulevard after he was "called in to detain that person."

16

He also testified that he was wearing a full police uniform, and he stopped and exited the vehicle, approached the suspect on the 1100 block of E Street, and told him to wait there, but the suspect "took off running" across E Street. Officer Woods did not testify about any observation from a confidential surveillance location. At trial, Officer Woods identified Palmer as the man he observed from his police vehicle. Officer Woods's testimony corroborated Officer Sanchez's testimony that he observed a Black male wearing a gray sweatshirt walking along Park Boulevard away from Officer Pajita and then turning onto E Street.

For the foregoing reasons, we reject Palmer's contention that the court was required to make an adverse finding under section 1042(a).

Palmer also contends the court erred in failing to make a determination, as required under section 1040, subdivision (b)(2), that "[d]isclosure of the information [was] against the public interest because there [was] a necessity for preserving the confidentiality of the information that outweigh[ed] the necessity for disclosure in the interest of justice."

We reject this contention. When the court sustained the surveillance location privilege after defense counsel asked Officer Pajita for the locations of the other surveillance team officers, the court—at defense counsel's request—told the jury, "Officer safety reasons. That's information the court is not going to require the witness to disclose." Later, when the court sustained the privilege again during the sidebar conference after defense counsel asked Officer Pajita how many other surveillance team officers had observed the narcotics transaction, the court ruled it would not require

17

Officer Pajita to answer any questions that would compromise his safety or the safety the other surveillance team officers. Although the court, in making these determinations, did not use the language set forth in section 1040, subdivision (b)(2), we conclude the court essentially complied with the requirement set forth in that subdivision because the court's findings were tantamount to a determination that "[d]isclosure of the information [was] against the public interest because there [was] a necessity for preserving the confidentiality of the information that outweigh[ed] the necessity for disclosure in the interest of justice." (§ 1040, subd. (b)(2).)

Even if we were to assume the court erred by failing to make a section 1042(a) adverse finding or otherwise erred by failing to follow the procedures mandated by sections 1040 and 1042, we would conclude any such errors were harmless beyond a reasonable doubt because the evidence of Palmer's guilt was overwhelming. Officer Pajita was the only witness who testified about the identity of the person who sold him the cocaine base. He identified Palmer both at the scene and at trial as the person who sold him the cocaine base. Officer Pajita was able to get a very close look at Palmer when he purchased the narcotics from him. As already noted, Officer Pajita testified that he and Palmer were "literally a foot apart" at the time of the transaction, and he noticed at that time that Palmer's hair was tied in the back in a pony tail and he wore wired glasses. Officer Pajita also testified that he communicated to the other surveillance team officers that he had purchased the drugs from a Black male wearing wired glasses and a gray hooded sweatshirt. Detective Sanchez testified that he heard Officer Pajita's description of the gray sweatshirt, he saw a Black male wearing a gray sweatshirt walking along Park

18

Boulevard away from Officer Pajita and then turning onto E Street, and he saw no other person in the area wearing a grey hooded sweatshirt. The photograph taken of Palmer that night corroborated Officer Pajita's description. It showed Palmer wearing a grey hooded sweatshirt and wire glasses, with his hair pulled back. In addition, as noted, Officer Woods identified Palmer at trial as the suspect he observed from his police vehicle. Officer Blomberg identified Palmer at trial as the suspect he handcuffed. For these reasons, we conclude any assumed error was harmless beyond a reasonable doubt.

## II. *INSTRUCTIONAL ERROR CLAIMS* (*CALCRIM Nos. 332, 251*)

### A. *CALCRIM No. 332*

Palmer next contends his conviction of selling a controlled substance should be reversed because the court prejudicially erred by failing to instruct the jury sua sponte under CALCRIM No. 332[7] regarding the weight to give expert testimony based on what Palmer claims is Officer Pajita's opinion testimony. This contention is unavailing.

---

7  CALCRIM No. 332 provides: "(A witness was/Witnesses were) allowed to testify as [an] expert[s] and to give [an] opinion[s]. You must consider the opinion[s], but you are not required to accept (it/them) as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

19

1. *Background*

During his testimony about the drug transaction, Officer Pajita stated that he walked up to the shorter Black male, who was wearing all dark clothing, and asked him where he could find a "twenty." The prosecutor asked Officer Pajita what a "twenty" meant, and Pajita replied, "*Twenty is essentially street jargon for $20 worth of a controlled substance*. In this case because I know *this area is known for cocaine base sales* and just from my experience and from reading other officer's reports, this has *always been a high narcotics area for cocaine base*. I asked him for a twenty, and in this case it was for cocaine base." (Italics added.)

Officer Pajita also testified that, after the shorter Black male said he did not have any, the second Black male wearing a gray sweatshirt[8] asked him what he was looking for, Officer Pajita told him he was looking for a twenty, and the Black male said he had it.

Shortly thereafter, the prosecutor asked Officer Pajita, "In your training and experience with narcotics sales, how often do you recover prerecorded currency that you use in undercover buys?" Pajita replied, "I would say *it's a split*. Sometimes we get it back and sometimes we don't. . . . [¶] . . . [¶] In the years I've been doing this with narcotics we['ve] recovered money and *we've lost money*. Just the other day we lost money." (Italics added.) Defense counsel objected that this testimony was irrelevant and

---

8       Both at the scene and at trial, as already noted, Officer Pajita identified Palmer as that second Black male.

nonresponsive, and the court overruled the objections, stating: "He's describing generally his experience with this."

Continuing his testimony, Officer Pajita stated: "Some weeks we recover [the prerecorded currency]. Some weeks we don't. These groups . . . don't always work alone. They work in groups the way we've come across it. Money can be easily tossed. Money can be easily eaten."

The prosecutor then asked Officer Pajita, "In your training and experience with narcotics sales, why is it that you don't always recover the prerecorded currency?" Officer Pajita replied, "[B]ecause we've been doing this so long in this area, they've *become accustomed to some of our tactics*. Most of the time the money can be eaten. It can be tossed or passed on, and it's very, very quick, so to explain, that's why we don't always retrieve our money." (Italics added.)

Later, while identifying the impounded cocaine base Palmer sold him and explaining why the evidence envelope contained "three to five pieces of rocks," rather than only the three pieces that Palmer sold to him during the drug transaction, Officer Pajita testified that in his training and experience, "[c]*ocaine base can separate very easily and break like a wafer*. When it's being impounded, sometimes it goes into a bin, and they do sometimes break." (Italics added.) Shortly thereafter, Officer Pajita testified that "[t]here is [*sic*] *always going to be little pieces that break off during the handling*." (Italics added.) Officer Pajita further testified that in his training and experience, the cocaine base was "*worth approximately $20 to $30*." (Italics added.)

21

2. *Applicable Law*

We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error, we examine the instructions as a whole." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246.)

When expert testimony is received in a criminal proceeding, Penal Code section 1127b[9] requires that the trial court give sua sponte an instruction regarding the evaluation, weight, and effect of such testimony. (*People v. Reeder* (1976) 65 Cal.App.3d 235, 241.) We assess, under the *Watson* standard, the prejudicial effect of the court's failure to give such an instruction (here, CALCRIM No. 332). (*Reeder*, at pp. 241, 243, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) Under the *Watson* standard, a trial court's erroneous failure to instruct on the evaluation, weight, and effect of expert testimony as required by Penal Code section 1127b is not prejudicial unless the reviewing court, upon an examination of the entire cause, determines it is reasonably probable the jury would have rendered a verdict more favorable to the defendant had the omitted instruction been given. (*Watson*, at p. 836; *Reeder*, at pp. 241, 243.) Probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more

---

[9]     Penal Code section 1127b provides: "When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows: [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable. [¶] No further instruction on the subject of opinion evidence need be given."

than an abstract possibility."  (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918.)

3.  *Analysis*

a. *Forfeiture*

We reject the Attorney General's claim that Palmer forfeited his claim of instructional error by failing to request below an instruction under CALCRIM No. 332. A defendant's claim on appeal that the trial court erroneously failed to give sua sponte a jury instruction is "of a kind . . . that require[s] no trial court action by defendant to preserve it" for appeal.  (*People v. Rogers* (2006) 39 Cal.4th 826, 850, fn. 7; see *People v. Tate* (2010) 49 Cal.4th 635, 697, fn. 34 ["We find no forfeiture, because we understand defendant's argument to be that the court should have given such an instruction sua sponte."].)  Here, although Palmer did not request below an instruction under CALCRIM No. 332, "we may overlook this forfeiture because he is now arguing that the trial court is under a sua sponte duty to instruct."  (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 73; see *Tate*, at p. 697, fn. 34; *Rogers*, at p. 850, fn. 7.)

b. *Merits*

In support of his claim that the court prejudicially erred by failing to give sua sponte an instruction under CALCRIM No. 332 on expert opinion testimony, Palmer (quoting Officer Pajita's testimony) maintains that Officer Pajita gave the following expert opinions based on his training and experience:  (1) a "twenty" is "street jargon for $20 worth of a controlled substance;" (2) the area where the crime occurred was "known for cocaine base sales" and had "always been a high narcotics area for cocaine base," so

23

that when Pajita asked Palmer for a "twenty," he knew Pajita meant cocaine base; (3) the reason the cocaine base shown to the jury in an evidence envelope was "three to five pieces of rocks," instead of the three pieces Palmer sold to him, was that cocaine base separates very easily and breaks like a wafer, and "little pieces" always "break off during the handling"; (4) the cocaine base Palmer sold was "worth approximately $20 to $30"; (5) it was common for prerecorded money not to be recovered during the undercover operations; (6) since drug dealers work in groups, prerecorded money can be easily passed on, tossed, or eaten; and (7) drug dealers have "become accustomed to some of our tactics" because the police have been working undercover for a long time in that area. Citing this court's decision in *People v. Ruiz* (1970) 11 Cal.App.3d 852 (*Ruiz*), Palmer asserts the instructional error was prejudicial and requires reversal of his conviction of selling cocaine base because "the prosecution relied heavily on the testimony of Officer Pajita," and "[w]ithout the instruction mandated by section 1127b, the jurors likely considered themselves less qualified than Pajita to determine the issues discussed in the opinions, and accepted the opinions without considering whether they were believable, reasonable or supported by the evidence in this case."

In response, the Attorney General argues (1) the court had no duty to instruct sua sponte on expert opinion testimony because Officer Pajita testified as a percipient witness, not as an expert witness, and he gave no expert opinion testimony; (2) *Ruiz* is distinguishable; and (3) and any instructional error here was harmless.

A trial court's erroneous failure to give a jury instruction on the evaluation, weight, and effect of expert opinion testimony as required by Penal Code section 1127b is not

24

necessarily prejudicial error.  (*People v. Lynch* (1971) 14 Cal.App.3d 602, 609 ["Although Penal Code section 1127b is mandatory when the opinion of an expert witness is received in evidence, and the trial court in this case did not give the instruction, prejudicial error did not occur."].)

Here, assuming, without deciding, that Officer Pajita gave expert opinion testimony and the court erred by failing to instruct sua sponte under CALCRIM No. 332, as Palmer contends, we conclude any such error was harmless under the applicable *Watson* harmless error standard because Palmer has failed to show there is a reasonable probability the jury would have rendered a more favorable verdict had the omitted instruction (CALCRIM No. 332) been given.  The court instructed the jury under CALCRIM No. 226 that "[y]ou alone, must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have."  The court also instructed under CALCRIM No. 226 that "[y]ou may believe all, part, or none of *any* witness's testimony. Consider the testimony of each witness and decide how much of it you believe."  (Italics added.)  That instruction also provided various factors for the jury to consider in evaluating *any* witness's testimony.

The court also gave CALCRIM No. 200, which informed the jury that they were the exclusive judges of the facts, and that it was "up to all of you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial."

25

We presume the jury in this case understood and followed the instructions the court gave under CALCRIM Nos. 200 and 226. (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9 ["the trial court instructed the jury not to draw an inference from defendant's decision not to testify, and we presume the jurors understood and applied the instruction"].)

Given the foregoing instructions, which largely cover the concepts in CALCRIM No. 332 (see fn. 7, *ante*), any error in not providing that instruction was harmless. (See *People v. Lynch*, *supra*, 14 Cal.App.3d at pp. 609-610 [finding error harmless where the jury was instructed they were the sole and exclusive judges of the facts, and they were entitled to weigh the credibility of any witness].) The jury was adequately instructed to consider and weigh the testimony of *each* witness, including Officer Pajita. By following the court's instructions under CALCRIM Nos. 200 and 226, the jury would have properly considered Officer Pajita's testimony, including any expert opinions he may have given.

Palmer's reliance on *Ruiz* is misplaced because it is distinguishable. In *Ruiz*, the defendant asserted an insanity defense, and, thus, the jury had to consider the issue of insanity in rendering its verdict. (See *Ruiz*, *supra*, 11 Cal.App.3d at pp. 855-856.) Thus, the expert opinion testimony given by two psychiatrists as to whether the defendant was legally insane at the time of his offenses was integral to his defense. Here, in contrast, Palmer's defense of mistaken identity did not rest on Officer Pajita's purported expert opinions. The jury's determination that Palmer was the person who sold the narcotics to Officer Pajita would not reasonably have been affected by Officer Pajita's testimony about the meaning of the street term "twenty," the area's being a high crime area, the

26

value of the narcotics sold to Officer Pajita, the fragility of cocaine base, the frequency with which law enforcement recover prerecorded currency in undercover operations, or the fact that narcotics dealers typically work in groups. The critical factual question Palmer raised in his defense was the identity of the person who exchanged 0.16 grams of cocaine base for the $20 Officer Pajita paid for the narcotics.

B. *CALCRIM Nos. 251*

Palmer also contends that both of his convictions must be reversed because the court prejudicially erred by failing to instruct sua sponte the jury under CALCRIM No. 251[10] regarding the required union or joint operation of act and mental state. This contention is unavailing.

We reach the merits of this second claim of instructional error over the Attorney General's assertion that Palmer forfeited the claim by failing to request below an instruction under CALCRIM No. 251. As already discussed, a defendant's claim on appeal that the trial court erroneously failed to give sua sponte a jury instruction is "of a kind . . . that require[s] no trial court action by defendant to preserve it" for appeal. (*People v. Rogers*, *supra*, 39 Cal.4th at p. 850, fn. 7.)

---

[10]    CALCRIM No. 251 provides: "The crime[s] [(and/or) other allegation[s]] charged in this case require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime[s] (in this case . . . ), that person must not only intentionally commit the prohibited act [or intentionally fail to do the required act], but must do so with a specific (intent/ [and/or] mental state). The act and the specific (intent/ [and/or] mental state) required are explained in the instruction for that crime [or allegation]."

Palmer's claim fails on its merits. Penal Code section 20 provides that "[i]n every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." Here, although the court did not instruct the jury under CALCRIM No. 251, the court gave other instructions adequately informing them that the prosecution had to prove both that Palmer committed the charged unlawful acts, and that, when he committed those acts, he acted with the requisite mental state. Specifically, as to count 2 (resisting arrest in violation of Pen. Code, § 148, subd. (a)), the court gave CALCRIM No. 2656, which specifically instructed the jury that "[*w*]*hen the defendant acted*, he knew or reasonably should have known, that Marlo Woods was a peace officer performing or attempting to perform his duties" (italics added). As to count 1 (selling a controlled substance in violation of Health & Saf. Code, § 11352, subd. (a)) the court gave CALCRIM No. 2300. Although that instruction did not include similar language, the court did give the jury CALCRIM No. 225 ("Circumstantial Evidence: Intent or Mental State"), which instructed the jury that the prosecution had to prove "not only that [Palmer] did the acts charged, but also that he acted with a particular intent." Thus, as to both counts, we conclude the court sufficiently instructed the jury that the prosecution had to prove both that Palmer committed the charged acts, and that, at the time he acted, he acted with the requisite mental state or intent.

### III. *ROMERO MOTION*

Next, Palmer contends his sentence must be reversed and the matter remanded for a new sentencing hearing because the court abused its discretion and violated his federal

28

constitutional right to due process by denying his motion under *Romero*, *supra*, 13 Cal.4th 497, to strike his prior strike conviction. We reject this contention.

A. *Background*

Following a bifurcated bench trial, the court found to be true allegations that (1) Palmer had suffered one prior narcotics sales conviction (Health & Saf. Code,§ 11370.2, subd. (a)), (2) he had suffered one prior strike conviction of aggravated assault (Pen. Code, § 245, subd. (a)(1)) for purposes of the Three Strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, 668), and (3) he had served two prior prison terms (Pen. Code, §§ 667.5, subd. (b), 668).

At the sentencing hearing, the court denied Palmer's opposed *Romero* motion to strike the prior strike aggravated assault conviction. The court found that since Palmer's 1993 aggravated assault conviction, he had suffered "a string of convictions including mostly felonies." The court also found that "the main thing that he's doing is selling drugs. That's how he's making his financial life work," and "that's exactly what [the] Three Strikes [law] speaks to. It's not that he's involved in another violent crime [like] his strike, but still dangerous and serious activity. [¶] And for that reason that court is going to deny the motion to strike the strike."

29

B.  *Applicable Law*

In *Romero*, *supra*, 13 Cal.4th at pages 529-530, the California Supreme Court held that Penal Code section 1385, subdivision (a)[11] permits a court acting on its own motion and "in furtherance of justice" to strike prior felony conviction allegations in cases brought under the Three Strikes law.  Although the Legislature has not defined the phrase "in furtherance of justice" contained in that subdivision, the California Supreme Court has held that this language requires a court to consider both the ""constitutional rights of the defendant, and the interests of society represented by the People""" (italics omitted) in determining whether to strike a prior felony conviction allegation.  (*Romero*, *supra*, 13 Cal.4th at p. 530.)

In *People v. Williams* (1998) 17 Cal.4th 148 (*Williams*), the California Supreme Court explained that, in determining whether to strike or vacate a prior strike allegation or finding under the Three Strikes law "in furtherance of justice" pursuant to Penal Code section 1385, subdivision (a), the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes law's] spirit, in whole or in part, and

---

11     Penal Code section 1385, subdivision (a), provides in part that a trial court "may, either of [its] own motion or upon the application of the prosecuting attorney, and *in furtherance of justice*, order an action to be dismissed.  The reasons for the dismissal shall be stated orally on the record.  The court shall also set forth the reasons in an order entered upon the minutes."  (Italics added.)

hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

In *People v. Carmony* (2004) 33 Cal.4th 367, 371 (*Carmony*), our high state court held a trial court's decision not to dismiss a prior strike conviction allegation under Penal Code section 1385, subdivision (a), is reviewed under the deferential abuse of discretion standard. (*Carmony*, at pp. 371, 376.) *Carmony* explained that "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at p. 377.)

C. *Analysis*

Applying the deferential abuse of discretion standard, as we must (*Carmony*, *supra*, 33 Cal.4th at p. 371), we conclude Palmer has failed to meet his burden on appeal of showing that the court's denial of his *Romero* motion was an abuse of discretion and that he should be deemed to be outside the spirit of the Three Strikes law. The record shows the court considered the factors discussed in *Williams*: "[T]he nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects." (*Williams*, *supra*, 17 Cal.4th at p. 161.) The record before the court demonstrated that, when Palmer committed his current offenses in January 2014, he was 43 years old and had a 30-year criminal record. He committed his strike prior offense—assault with a deadly weapon (a gun) in violation of Penal Code section 245, subdivision (a)—in 1992, and was sentenced to six years in state prison after his probation in that case was revoked. He then violated parole three times in that case. In late 2001 Palmer committed another felony (possession

31

of cocaine for sale), for which he was sentenced to nine years in state prison. In early 2011, just two days after being released from prison in that case, he violated his parole. Palmer committed his current offenses in January 2014, less than two years after he discharged from parole.

The foregoing record supports the court's finding that Palmer falls within the spirit of the Three Strikes law. In denying Palmer's *Romero* motion, the court stated: "[Y]ou hope that the punishments act as . . . some rehabilitative effort. And in [Palmer's] case, it does not look [like] that has happened." We conclude the court did not abuse its discretion. Accordingly, we affirm the court's order denying Palmer's *Romero* motion.

## IV. *CUMULATIVE ERROR CLAIM*

Last, Palmer contends the cumulative effect of the court's errors undermined the fundamental fairness of the trial and the reliability of the guilty verdicts. We reject this contention.

"'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) A defendant is "entitled to a fair trial but not a perfect one." (*Ibid*.)

Here, any errors did not rise by accretion to the level of reversible and prejudicial error. Accordingly, we affirm the judgment.

32

## DISPOSITION

The judgment is affirmed.


NARES, J.

WE CONCUR:


BENKE, Acting P. J.


McINTYRE, J.